In re Interest of Joseph S. et al.,
a child under 18 years of age.
State of Nebraska, appellant, v.
Kerri S., appellee.
___ N.W.2d ___

Filed January 21, 2014.    No. A-13-339.

1.  **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.
2.  **Parental Rights.** The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child.
3.  **Constitutional Law: Parental Rights: Due Process.** The fundamental liberty interest of natural parents in the care, custody, and management of their children is afforded due process protection.
4.  **Parental Rights: Due Process.** State intervention to terminate the parent-child relationship must be accomplished by procedures meeting the requisites of the Due Process Clause.
5.  **Parental Rights: Due Process: Final Orders: Appeal and Error.** Due process rights are of such importance that a parent's failure to appeal from an adjudication order, dispositional order, or other final, appealable order leading to the termination of parental rights will not preclude an appellate court from reviewing the entire proceeding for a denial of due process in an appeal from a termination order.
6.  **Constitutional Law: Due Process.** Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker.

Appeal from the Separate Juvenile Court of Douglas County: Elizabeth Crnkovich, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, and Jennifer Chrystal-Clark for appellant.

Thomas C. Riley, Douglas County Public Defender, Christine D. Kellogg, and Zoë Wade for appellee.

Maureen K. Monahan, guardian ad litem.

Irwin, Pirtle, and Bishop, Judges.

Pirtle, Judge.

## INTRODUCTION

The State of Nebraska appeals the order of the separate juvenile court of Douglas County finding that the three minor children of Kerri S. did not come within the meaning of Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012) and finding that it was not in the children's best interests to terminate Kerri's parental rights. This appeal presents us with an apparent issue of first impression, that being whether a parent's noncompliance with State-offered services which are voluntary in nature may serve as a basis to terminate the parent's rights under § 43-292(2). The juvenile court answered that question in the negative. Because we agree with the juvenile court, we affirm.

## BACKGROUND

Kerri is the biological mother of Joseph S., born in January 2000; William S., born in November 2005; and Steven S., born in December 2006.

Kerri and the children came to the attention of the Nebraska Department of Health and Human Services (DHHS) on March 16, 2009. In that case, Kerri was found to have completed the court-ordered and court-monitored plan. The children were returned to her care, and the case was closed successfully in November 2011.

Kerri's family attracted the attention of DHHS a few months later, and she cooperated with services on a voluntary basis. Kerri had tested positive for cocaine, and she began voluntary urinalysis (UA) testing. The "voluntary" stage of DHHS' involvement with Kerri lasted until August 2012, approximately 8 months.

On August 9, 2012, the State filed a petition alleging the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) by reason of the faults or habits of Kerri. The State also filed a motion for temporary custody and an affidavit for removal of the minor children from the home. The juvenile court ordered DHHS to take immediate custody of the minor children.

The petition alleged the children came within the meaning of § 43-247(3)(a) in that (1) Kerri's use of alcohol and/or controlled substances placed the children at risk for harm; (2) Kerri had been offered voluntary services with DHHS and the Nebraska Families Collaborative (NFC), but she failed to participate or engage in services; (3) Kerri failed to put herself in a position to appropriately parent the children; (4) Kerri failed to provide safe, stable, and/or appropriate housing; (5) Kerri failed to provide proper parental care and support for the children; and (6) due to the above allegations, the children were at risk for harm.

On December 19, 2012, the State filed an amended petition. Count III alleged the children were within the meaning of § 43-292(2) because Kerri substantially and continuously or repeatedly neglected and refused to give the children or a sibling of the children necessary parental care and protection. Count IV alleged termination of Kerri's parental rights was in the best interests of the children.

An adjudication hearing took place in this case on March 13, 2013.

Melissa Misegadis, a family permanency supervisor with NFC, testified that she began working with Kerri in July 2010 as the family's service coordinator. Misegadis testified that the children were out of the home during the first case for 1 year, between July 2010 and July 2011. Misegadis testified that the family was offered supervised visitation; family support; peer-to-peer mentoring; mental health services, including individual and family therapy; random drug testing; and psychotropic medication management.

Misegadis testified that during the pendency of the case, Kerri was not consistently compliant with the services, but that "Kerri would always end up doing as we had asked her to do." Misegadis said Kerri's biggest issue was "follow-through," consistently attending every visit, completing all UA testing, and participating in every appointment. Despite these issues, Misegadis recommended that the children be returned to Kerri's home because Kerri had been demonstrating a sober lifestyle and the ability to make appropriate decisions regarding whom she would allow her children to be around. Kerri

was visiting with the children consistently, was compliant with her medication management, and had positive reports from her therapist. Misegadis testified that Kerri completed "family support," as well as individual therapy and family therapy. She also testified that Kerri had a positive UA test in September or October 2010, but did not have another through the close of that case on November 28, 2011.

At that time, Misegadis referred the family to aftercare through NFC, because she was concerned about a possible relapse. Misegadis had no further contact with the family until an intake occurred on December 20, 2011. DHHS investigated the intake and determined it was unfounded.

On January 12, 2012, DHHS received another intake with allegations that the children were left with a relative and that Kerri was unreachable. There was also concern that there was a lack of supervision and that Kerri was using methamphetamine. Misegadis said that DHHS transferred the case to NFC and that Kerri indicated she was willing to work with DHHS on a voluntary basis. Misegadis testified a parent can ask that his or her children be returned to the home at any time. She stated that if a parent requests the return of the children to the home and that there are safety concerns, there is a possibility DHHS will file for removal in juvenile court.

Misegadis attended team meetings, and Kerri agreed to UA testing to alleviate concerns about drug use. Kerri admitted to using marijuana and indicated it was an isolated incident. Kerri signed a voluntary placement agreement, placing the children in foster care and making them wards of the State. Misegadis testified that the timeframe for voluntary placement is 180 days and that the parent can request that a child be returned to them at any time during the 180-day timeframe. Misegadis testified Kerri did not consistently take part in the requested UA testing during the voluntary period. She testified that in August 2012, the NFC staff learned the voluntary placement was to end, so it made the decision to file for removal due to safety concerns which would arise if the children were to return to Kerri's home.

Anne Petzel, a family permanency specialist employed by NFC, testified that she worked with Kerri and the children

between August 6 and 13, 2012. Petzel testified that she conducted a drop-in visit to Kerri's home on August 6 and found that the home was in disarray. Petzel testified there were piles of clothes around the home; beds "propped against the wall, unmade"; and people in the home who did not belong there. She testified that she saw a woman sleeping on one of the beds with no sheets, graffiti on the walls, and empty alcohol bottles around the home. Petzel said that there were approximately five adults in the house and that Kerri described these adults as friends who were there to help her paint and get the home ready for the children to return.

Petzel said that Kerri stated she would remove the alcohol bottles before the children returned to the home and that they discussed safety guidelines and the expectation that the home must be clean. Kerry told Petzel that the home would be ready for the children to return on August 15, 2012. Petzel stated that the kitchen was clean, although there was little food in the refrigerator, and that there were no foul odors throughout the residence. Petzel said that the case was then transferred to a court-specific team; such teams are employed after a voluntary case goes to court.

Brenda Alvarado, a drug test specialist, testified that Kerri became her client in November 2011 and remained her client at the time of the adjudication.

Alvarado testified that in January 2012, Kerri was tested on a weekly basis, and that her frequency increased to eight times per month in June 2012. Alvarado testified that Kerri consistently submitted to UA testing four to five times per month until July. Between January and July 2012, Kerri tested positive for amphetamines during the first test; a mixture of amphetamines, THC, and methamphetamine during the second test; and methamphetamine during the third test.

There were a few tests between July and December 2012, and the results were negative. During this time period, the UA testing was voluntary. Alvarado testified that during that period, she frequently had trouble contacting Kerri by telephone, and that when that happened, she would either proceed to Kerri's home or notify Kerri's family permanency supervisor.

The frequency of the UA testing decreased to once a month in March 2013. Alvarado stated that she received one UA test from Kerri in 2013 and that she was unsuccessful two other times because she did not have reliable contact information for Kerri. The preliminary test in March 2013, which was taken the Saturday before the hearing, was negative.

Tiffany Martin, a family permanency specialist employed by NFC, testified that she began working with Kerri in August 2012 and was the family permanency supervisor at the time of adjudication. Martin testified that she met with Kerri on September 6 at NFC and that they discussed visitation and Kerri's mental health. At the time of the meeting, visits had ceased because of lack of consistency. Martin testified that by the next team meeting in November 2012, Kerri was living with a friend and no longer had her own residence. Kerri accepted family support services, but Martin said they were not set up. Martin testified that UA testing was still in place and that Kerri was attending Alcoholics Anonymous meetings. Martin testified that she had difficulty making contact with Kerri and that team meetings did not occur in October or December 2012.

At a team meeting in January 2013, Kerri reported that she started participating in an intensive outpatient program through a family service organization and that she had a psychiatric evaluation set up through a doctor. Martin testified that she was later informed that Kerri was on the waiting list. Martin testified that Kerri "was on her medication" and that she "seemed to be in a very positive place." After the team meeting in January, Kerri attended one visit with the children, and Martin testified Kerri did not make progress or engage in services. Martin testified that there may have been more visits, but that she had not talked with all of the individuals who were approved for visits. Martin testified that Kerri's parental rights should be terminated because of her lack of progress and the length of time the children had been in foster care. Martin testified that Kerri was supposed to set up a psychiatric evaluation, but Martin did not hear from Kerri about whether the appointment was scheduled, and that she was not able to

contact Kerri "to follow up." Martin testified she relied on Kerri to set up her own services because it is important for parents to make efforts in their own behalf.

The juvenile court found the children to be within the jurisdiction of the court and found the children to be within the meaning of § 43-247(3)(a) by a preponderance of the evidence. The juvenile court found that the children did not come within the meaning of § 43-292(2) and that it was not in the best interests of the children to terminate Kerri's parental rights. The juvenile court dismissed counts III and IV of the amended petition for failure to present a prima facie case. The court ordered the children to remain in the temporary custody of DHHS.

The State timely appeals.

## ASSIGNMENTS OF ERROR

The State asserts that the juvenile court erred in not finding clear and convincing evidence Kerri's parental rights should be terminated under § 43-292(2) and that termination of parental rights was in the children's best interests.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

## ANALYSIS

[2,3] The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). The fundamental liberty interest of natural parents in the care, custody, and management of their children is afforded due process protection. *Id.*

[4,5] State intervention to terminate the parent-child relationship must be accomplished by procedures meeting the requisites of the Due Process Clause. *In re Interest of Mainor T. & Estela T., supra*. Due process rights are of such importance that a parent's failure to appeal from an adjudication order, dispositional order, or other final, appealable order leading to the termination of parental rights will not preclude this court from reviewing the entire proceeding for a denial of due process in an appeal from a termination order. See *id*.

This is not an appeal of a termination order, but, rather, an appeal of an order of the juvenile court which did not terminate a mother's parental rights for want of clear and convincing evidence that the statutory provisions of § 43-292 were met and that termination was in the children's best interests.

The evidence shows that in January 2012, Joseph, William, and Steven were not under the jurisdiction of the juvenile court, but that they were removed from Kerri's home because she had agreed to cooperate with services of NFC on a voluntary basis. The voluntary basis period was to last for a term of 180 days. After the voluntary period, the State filed pleadings to adjudicate the children, bringing them under the jurisdiction of the juvenile court. Shortly after doing this, the State filed an amended petition seeking termination of Kerri's parental rights. The facts supporting the termination consisted of evidence from a previous juvenile case which had been satisfactorily completed and closed, as well as evidence of Kerri's actions during the voluntary basis period.

As stated earlier, this is a case of first impression, because this court and the Nebraska Supreme Court have not previously considered any cases where the removal of children and the eventual petition to terminate parental rights stem from a "voluntary basis" agreement. Though the nuances of a voluntary basis agreement have not been considered by Nebraska courts, the law with regard to due process is well established.

[6] Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse

witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004).

The Nebraska Juvenile Code provides for such due process protections for both parents and children. The code specifically cites that it is to "provide a judicial procedure through which these purposes and goals are accomplished and enforced in which the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced." Neb. Rev. Stat. § 43-246(7) (Cum. Supp. 2012).

Based upon our review of the record, there is little evidence that Kerri or the children were afforded due process at the beginning, or throughout the voluntary phase, of this case. The voluntary placement agreement was not entered into evidence, so we cannot determine whether Kerri was made aware that concerns about her alleged drug use and alleged inability to appropriately and safely provide for the children placed them at risk for harm. There is no evidence that Kerri was advised to consult with an attorney about voluntarily placing her children in the care of the State, which effectively gave the State legal custody of the children.

It is unclear whether Kerri was informed that she had the right to request the return of the children to the home at any time during the 180-day voluntary period or whether she was aware that requesting the return of the children could trigger a filing for removal in the juvenile court.

Also, there is no evidence that she was represented by an attorney during the voluntary period, nor did she have a hearing to address or refute the allegations before an impartial decisionmaker. While it is likely that Kerri was aware of the allegations of drug use, because she agreed to participate in UA testing, the testing was voluntary and was not part of a court-ordered plan. There is no evidence that she was advised to consult with an attorney before voluntarily participating in services. Further, there is no evidence Kerri was aware that making such an agreement could result in evidence of her level of compliance with the plan, which evidence could then

be used against her when the children were adjudicated and a petition was filed to terminate her parental rights.

Once a case is adjudicated under § 43-247(3)(a), the State is charged with identifying a plan for the family and establishing services to achieve the goals of the plan. DHHS has the duty to file a report and a case plan within 30 days after a juvenile has been placed in its custody and every 6 months thereafter. Neb. Rev. Stat. § 43-285(3) (Cum. Supp. 2012). The prosecutor, attorneys, and guardian ad litem all have the opportunity to agree, disagree, or ask for additions to or deletions from the plan, and the guardian ad litem submits a report. In addition, unless the case comes under a specific exception, when children are removed from the parental home, a court must make a finding that the State has made reasonable efforts to preserve and reunify the family under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2012).

The voluntary placement agreement in this case circumvented the established statutory processes for removal and petitions for termination of parental rights, and we find Kerri was denied due process of law. As a result, Kerri's compliance during the voluntary basis period is not acceptable evidence to be used to satisfy the statutory requirements to terminate her parental rights.

## CONCLUSION

We find the evidence used to support the termination of Kerri's parental rights to her children was a violation of her due process rights. We find the juvenile court did not err in finding there was not clear and convincing evidence to support the termination of Kerri's parental rights under § 43-292(2).

Affirmed.